IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| RICHARD R. SCOTT | ) | |
| | ) | Case No: 2:08-CV-98 |
| v. | ) | MATTICE/CARTER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and Title

XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382. This matter was referred to

the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil

Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion

for Summary Judgment (Doc. 11) and defendant's Motion for Summary Judgment (Doc. 18).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

AFFIRMED.

### Plaintiff's Age, Education, and Past Work Experience

Plaintiff was 46 years old on October 18, 2004, when he alleges he became disabled by

hepatitis C, dyslexia, acid reflux, and heart problems (Tr. 46, 301-302). Prior to the onset of his

alleged disability, Plaintiff worked intermittently as a carpenter/laborer (Tr. 66, 107, 328-329).

1

<u>Applications for Benefits</u>

Plaintiff filed his applications for Disability Insurance Benefits and Supplemental Security Income in November and October 2004, respectively, alleging that he became disabled on October 18, 2004 (Administrative Record (Tr) 46-48, 301-313). On January 30, 2007, Plaintiff testified at a hearing before Administrative Law Judge (ALJ) William Overton (Tr. 324-343). A vocational expert also testified (Tr. 339-342). On March 15, 2007, the ALJ issued a decision, finding that Plaintiff was not disabled because there were a significant number of jobs in the national economy that he could perform (Tr. 11-22). On February 1, 2008, the Appeals Council denied review of the ALJ's decision (Tr. 5-7), at which time the March 15, 2007 decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

<u>Standard of Review - Findings of the ALJ</u>

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

2

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs*., 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs*., 790 F.2d 450 n. 4 (6th Cir. 1986).

After consideration of the entire record, the ALJ made the following findings:

> 1. The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2005.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant's atherosclerotic coronary artery disease status post myocardial infarction; chronic lung disease; hepatitis C; and second grade reading level are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to perform work at the light level of exertion that does not include activities around dust or other respiratory irritants and exposure to temperature extremes; that is consistent with a diagnosis of hepatitis; and that is consistent with a second grade reading level.

7.  The claimant is unable to perform any of his past work (20 CFR 404.1565 and 416.965).

8.  The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

9.  The claimant has a "limited education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. Considering the types of work that the claimant is still functionally capable of performing in combination with the claimant's age, education and work experience, he could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy. Examples of such jobs include work as a stock clerk, a hand packer, a machine tender, an off bearer, a non-construction laborer, a sorter, and an assembler. These jobs exist in significant numbers in the national economy.

12.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 21-22).

Plaintiff asserts the ALJ erred (1) in giving greater weight to the opinion of a consulting physician than to the opinion of Plaintiff's treating physician, (2) in failing to contact Plaintiff's treating medical provider as required by 20 CFR § 404.1512(e), and (3) in finding there exists a significant number of jobs for Plaintiff, despite the VE's testimony the number available is "not a very big number" if Plaintiff is to avoid being cut or bruised due to taking blood thinners. (Plaintiff's Brief, Doc 12, pp. 7-11).

I will analyze the facts and law to determine if there is substantial evidence to support the conclusion of the ALJ that plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision.

## Relevant Facts

Plaintiff was 46 years old on October 18, 2004, when he alleges he became disabled by hepatitis C, dyslexia, acid reflux, and heart problems (Tr. 46, 301-302). Prior to the onset of his alleged disability, Plaintiff worked intermittently as a carpenter/laborer (Tr. 66, 107, 328-329).

**A.     Testimony of Plaintiff**

At the January 30, 2007 hearing, Plaintiff testified that he had a heart attack in 2004 (Tr. 329). He identified his heart attack, along with a "disability to breathe," as his most serious problems (Tr. 329). He reported taking medication for chest pain and dizzy spells (Tr. 329). He stated that, in the past, depression had interfered with his ability to work but denied it currently did so (Tr. 330). He also testified to having hepatitis C and stomach problems, which caused vomiting and diarrhea "spells" that could last up to three days (Tr. 330-334). These "spells" occurred every three months and sometimes twice a month (Tr. 333-334). In addition, he stated

6

that he is fatigued since having his heart attack (Tr. 331). He also reported that he cannot write and is a poor reader, but, nonetheless, has an average IQ and is able to count money and drive (Tr. 327-328). He stated that he must avoid dust and temperature extremes due to his breathing problems (Tr. 334-335). He also reported that blood thinning medication requires him to avoid getting cut or bruised (Tr. 335). He testified that his health insurance had been discontinued and that, as a result, he had not seen his cardiologist recently, but that Dr. Shine, his treating physician, continues to treat him and provide him with medications (Tr. 337-338).

Plaintiff testified that he fishes, takes walks, and drives occasionally (Tr. 332-333). He reported daily napping for three hours in the afternoon (Tr. 335). He denied cutting firewood for one to two hours at a time, as stated in the doctors' notes in the record (Tr. 334). He also denied being able to perform light work on a full-time basis, stating that some days he cannot "get out of bed, much less do anything" (Tr. 337).

**B. Medical Evidence**

The administrative record shows that Plaintiff suffered a heart attack on October 18, 2004 (Tr. 168-181). At that time, Plaintiff was treated by Dr. Kahn, a cardiologist, and received an emergency cardiac catheterization test, revealing stenosis of two arteries (Tr. 168). He underwent successful angioplasty and stenting and was discharged from the hospital on October 21, 2004 (Tr. 168-169). His medications upon discharge included Plavix, Coreg, Altace, Pravachol, Ecasa, and Xanax (Tr. 174).

Plaintiff returned to the emergency room two days later on October 23, 2004, complaining of abdominal pain accompanied by vomiting, nausea, and diarrhea (Tr. 183-185). He was treated by Dr. Sunil John, who found that Plaintiff's symptoms were caused by

7

gastroesophageal reflux disease (GERD)(Tr. 184). Plaintiff was discharged the following day, on

October 24, 2004, with no restrictions on his activities (Tr. 182). At the time of Plaintiff's

discharge, his medications included Protonix, Phenergan, Plavix, Altace, Coreg, and Xanax (Tr.

182).

On October 27, 2004, in a follow-up visit with his treating physician, Dr. Shine, Plaintiff

reported feeling better and denied stomach or chest pain (Tr. 124). Dr. Shine referred to

Plaintiff's hepatitis C and noted he might hold off liver biopsy until he was off Plavix. (Tr. 124).

Dr. Shine found that the heart condition was stable, observed that Protonix helped the chronic

gastritis, and instructed monitoring of the hepatitis C until a biopsy could be performed (Tr. 124).

Plaintiff returned again to the emergency room on November 11, 2004, complaining of pain in

his chest and shoulder (Tr. 195). Dr. Hamati treated Plaintiff, ordering a cardiac catheterization,

which revealed stenosis in two more arteries (Tr. 207-208). Dr. Hamati treated Plaintiff with

medication (Tr. 208).

In a follow-up examination on November 30, 2004, Dr. Kahn ordered continued

treatment of Plaintiff's coronary heart disease through medication as well as prevention, risk

factor modification, patient education, reassessment by non-diagnostic testing, and risk

stratification if dysfunction is noted (Tr. 211-212). Plaintiff complained to Dr. Kahn of

occasional episodes of atypical chest pain, which Plaintiff described as tightness in the chest

accompanied by a soreness sensation (Tr. 211). He denied dizziness but complained of shortness

of breath upon exertion (Tr. 211).

On December 14, 2004, in a follow-up visit, Dr. Shine noted that Protoniz did not relieve gastritis and ordered a switch to Prilosec (Tr. 122). As for Plaintiff's hepatitis C, Dr. Shine noted a high viral load (Tr. 122). Dr. Shine made no change to Plaintiff's heart medication (Tr. 122). An exercise stress test on January 11, 2005, revealed no chest pain and no myocardial ischemia (Tr. 215-216). An echocardiograph on January 25, 2005, showed improvement in Plaintiff's global left ventricular systolic function since his October 2004 heart attack (Tr. 213-214). It also showed left ventricular hypertrophy (Tr. 213-214).

Plaintiff saw Dr. Shine again on February 2, 2005, for elevated blood pressure and weight gain (Tr. 120). Dr. Shine prescribed hydrochlorothiazide, Norvasc, and Coreg (Tr. 120). Plaintiff complained of not being "back to normal," shortness of breath with "significant exercise," and financial stress from not working (Tr. 120). On February 9, 2005, in a follow-up visit, Dr. Shine noted that Plaintiff's hypertension was controlled (Tr. 118). Dr. Shine prescribed Albuterol for bronchitis (Tr. 118).

In a follow-up exam with Dr. Kahn on February 22, 2005, Plaintiff reported feeling fatigued and weak, complained of lacking energy, and asserted he experienced dyspnea on exertion (Tr. 209). Dr. Kahn assessed Plaintiff as having coronary artery disease, abnormal stress test, hypertension, and dyslipidmia (Tr. 210). Plaintiff's medications included Coreg, Plavix, Norvasc, and hydrochlorothiazide (Tr. 209). Dr. Kahn additionally prescribed Altace to control blood pressure (Tr. 210).

On March 2, 2005, Plaintiff continued to complain to Dr. Shine of chest congestion and shortness of breath (Tr. 116). Dr. Shine opined that Plaintiff may have chronic obstructive pulmonary disease (COPD) as well as bronchitis and ordered a Combivent nebulizer and

9

discontinued the hydrochlorothiazide (Tr. 116).  Dr. Shine found Plaintiff's heart condition stable (Tr. 116). On April 20, 2005, Dr. Shine reported that Plaintiff was doing well overall (Tr. 114). His blood pressure increased with exercise but dropped "fairly quickly" afterwards (Tr. 114).

On April 24, 2005, as part of Plaintiff's disability application, Dr. Knox-Carter reviewed the records and assessed Plaintiff's physical residual functional capacity (Tr. 217-222).  She found that Plaintiff could occasionally lift 50 pounds and could frequently lift 25 pounds and, aside from avoiding extreme heat and cold, had no other work limitations. (Tr. 217-222).  Dr. Knox-Carter further concluded that there was no evidence of liver disease, despite the hepatitis C diagnosis, and that Plaintiff's acid reflux disease was not severe (Tr. 219).  She further concluded that there was no medical evidence in the record to support Plaintiff's dyslexia claim (Tr. 219).

On May 20, 2005, Plaintiff was again treated in the emergency room, complaining of shortness of breath and chest pressure (Tr. 224-226).  A cardiac catheterization revealed a moderate degree of coronary artery disease, and Dr. Kahn advised treating with medication (Tr. 226-229).  Plaintiff was restricted from driving for 24 hours and lifting more than 10 pounds for 48 hours (Tr. 225).  Plaintiff's medications included Plavix, Aspirin, Altace, Topral, Pravachol, and nitroglycerin (Tr. 229).

On July 5, 2005, in a follow up visit with Dr. Shine, Plaintiff reported he was unable to work full time and complained of tiring easily but reported working 2 hours per day (Tr. 287). Dr. Shine observed that Plaintiff had no chest pain (Tr. 287).  She also found that he suffered from mild COPD (Tr. 287).  On July 26, 2005, Plaintiff informed Dr. Shine that his insurance for his medications would shortly expire (Tr. 285).  Dr. Shine noted that Plaintiff had significant COPD that was "somewhat reversible" (Tr. 285).  Dr. Shine gave Plaintiff a handout on free

programs for Norvasc, Plavix, and Coreg (Tr. 285). She changed his heart medication from Altace to Enalapril (Tr. 285). She also changed his GERD medication to Omeprazole and his cholesterol medication to Lovastatin (Tr. 285).

On August 23, 2005, Dr. Kahn examined Plaintiff in a follow-up visit (Tr. 266-267). Dr. Kahn noted that Plaintiff had a medical history significant for an extensive anterior wall myorcardial infarction; most recent cardiac work-up showed a 40% stenosis of distal left main. His ejection fracion had improved from 30% to 60%. He had considerable problems with shortness in breath, partly due to chronic lung disease (Tr. 266). Dr. Kahn found that Plaintiff's impairments included coronary artery disease and COPD, as well as dyslipidemia (Tr. 266-267). Plaintiffs medications included Plavix, Lovastatin, Spiriva, Toprol, and Aspirin (Tr. 266). Dr. Kahn advised Plaintiff regarding prevention and risk factors and instructed him to continue with treatment through his current medications (Tr. 267).

On September 26, 2005, Steven Lawhon, Psy.D., interviewed Plaintiff, administered tests, and conducted a mental status examination (Tr. 245-248). He found Plaintiff's intellectual functioning average and concluded that Plaintiff was mildly to moderately depressed due to medical problems and recommended treatment (Tr. 246-247). He concluded that Plaintiff's ability to understand, remember, and interact socially were not significantly limited but that his ability to sustain concentration and persistence and adapt in a work environment were mildly limited (Tr. 248). Plaintiff's activities were reported to include fishing, playing guitar, mowing the yard, gardening, and wood carving (Tr. 247). Plaintiff reported staying in bed on bad days and doing small carpentry and remodeling jobs on good days (Tr. 247).

11

On September 29, 2005, Dr. Filka, a state-appointed physician, examined Plaintiff (Tr. 232-238). At this visit, Plaintiff reported having tightness in the chest about once a week with or without exertion and occasional left arm pain, nausea, and shortness of breath (Tr. 232). Plaintiff stated that nitroglycerin usually relieved his pain (Tr. 232). He also asserted that he cut firewood for one to two hours at a time to "keep busy" (Tr. 233). Dr. Filka found that Plaintiff's impairments included coronary heart disease, angina-type chest pain, hypertension, emphysema, hepatitis C, GERD, dyslexia and illiteracy, arthritis in the hands without pain, and probable depression (Tr. 237). In her opinion, Plaintiff's only work restriction, given his coronary heart disease and chest pain, was no heaving lifting, pushing, or pulling (Tr. 237). Based upon his claim of chopping firewood, she found that Plaintiff was capable of light to medium work and could work full-time (Tr. 237).

On October 23, 2005, Plaintiff went to the emergency room, complaining of nausea and vomiting (Tr. 292-299). Tests of the abdomen and chest were unremarkable (Tr. 296-299).

On November 16, 2005, Dr. Allison reviewed the updated records and gave an opinion on Plaintiff's physical residual functional capacity (Tr. 239-244). He, likewise, found Plaintiff could occasionally lift 50 pounds and could frequently lift 25 pounds and, aside from avoiding extreme heat and cold, had no other work limitations (Tr. 239-244). Dr. Allison referred to the notation that Plaintiff reported cutting firewood for one to two hours without difficulty (Tr. 241).

A psychiatric review by Edward Sachs, Ph.D., on November 21, 2005, stated that Plaintiff was mildly limited due to his mood disorder (Tr. 249-261). Plaintiff's psychiatric allegations were found to be credible but not related to any loss of functioning (Tr. 261).

On November 22, 2005, Plaintiff reported to Dr. Shine that his prescriptions needed refilling but that he had no money (Tr. 283). Plaintiff further reported that he did not have any income and was unable to work due to his heart problems and COPD (Tr. 283). Dr. Shine changed Plaintiff's heart medication to Lotrel, noted Plaintiff's need for Plavix for hypertension, and continued Plaintiff on Lovastatin for cholesterol (Tr. 283). On January 19, 2006, Dr. Shine treated Plaintiff for bronchitis, prescribing Amoxicillin, and instructed Plaintiff to continue as usual with his other medications (Tr. 281). Plaintiff complained of having an episode of chest pain the prior week, which improved with medication (Tr. 281).

In an opinion letter, dated January 19, 2006, Dr. Shine stated that she had treated Plaintiff since 2002 (Tr. 113). She noted that Plaintiff has severe emphysema, gets exhausted very easily, cannot perform any physical activity for a sustained period of time and was therefore unable to hold down a job (Tr. 113).

On April 5, 2006, Dr. Shine treated Plaintiff for nausea, vomiting, and diarrhea. Plaintiff reported running out of his GERD medication the prior week. Dr. Shine prescribed Prevacid and noted that Plaintiff needed to stay on his medications for GERD and heart problems (Tr. 279).

On June 2, 2006, Plaintiff was treated by Dr. Clayton, a colleague of Dr. Shine's, and complained of weakness. Dr. Clayton found that Plaintiff's blood pressure was low. The balance of the treatment note is not legible other than a statement that Dr. Clayton did not prescribe any new medications (Tr. 277).

On July 17, 2006, Dr. Shine treated Plaintiff for weakness and dizzy spells. Plaintiff observed that the spells were accompanied by low blood pressure. Plaintiff, otherwise, reported no change and denied chest pain. Dr. Shine ordered Plaintiff to discontinue use of Norvasc, to

13

keep a blood pressure log, and to return in one month. Dr. Shine additionally noted that Plaintiff had no money or insurance to see a doctor for his hepatitis C (Tr. 275).

On August 3, 2006, the last of Dr. Shine's treating notes in the record, Plaintiff's blood pressure was noted to be elevated. Dr. Shine instructed Plaintiff to resume Norvasc when his blood pressure was elevated and to discontinue its use when it becomes low. Plaintiff complained of vomiting and diarrhea the previous day but reported feeling better. Plaintiff also complained of sharp chest pain off and on in the previous three weeks. Dr. Shine prescribed Imdur for Plaintiff's chest pain (Tr. 273).

In support of Plaintiff's disability application, Dr. Shine prepared a letter, dated January 25, 2007, stating that Plaintiff was short of breath with mild exertion and that his endurance was extremely limited. Dr. Shine observed that Plaintiff has emphysema and coronary heart disease, which greatly limits his exercise capacity and noted Plaintiff's limited education. Dr. Shine concluded that Plaintiff's condition was not likely to improve and that Plaintiff cannot perform physical labor for a full workday, or even 30 minutes (Tr. 300).

## C.    Testimony of the Vocational Expert

The ALJ asked the vocational expert (VE) to consider a hypothetical individual of Plaintiff's age, education, work experience, and residual functional capacity for light work activity, avoiding activities around dust and other respiratory irritants and exposure to temperature extremes because of a respiratory impairment (Tr. 20, 339-341). In addition, the ALJ instructed the vocational expert to consider the mental limitations set forth by Dr. Lawhon (Tr. 20-21, 339-341). The VE testified that such an individual could perform light work as a stock clerk, a hand packer, a machine tender, an off bearer, a non-construction laborer, a sorter,

14

and an assembler, totaling 1,650 jobs in the region and 650,000 jobs nationally (Tr. 20-22, 339-341). The VE testified that if Plaintiff was unable to work a full eight-hour day, as opined in Dr. Shine's January 25, 2007 letter, Plaintiff could not perform the jobs identified (Tr. 300, 341).

The vocational expert further testified that if there are additional limitations of no bruising or cutting due to blood thinning medication, the total would fall to 875 jobs in the region and 425,000 jobs nationwide (Tr. 341). Moreover, drowsiness and sluggishness that interfere with reliability and dependability eliminate any such jobs (Tr. 341-342). Similarly, if an inability to walk "very far" and an inability to persist, along with breathing problems, are included in the hypothetical, no such jobs would exist (Tr. 342).

<u>Analysis</u>

In determining Plaintiff's residual functional capacity, and, ultimately finding Plaintiff not disabled, the ALJ concluded that Plaintiff was not completely credible and that Dr. Shine's opinions were not controlling (Tr. 14-22). I conclude substantial evidence supports the ALJ's findings.

A.  **Did the ALJ Err in Giving Greater Weight to the Opinion of the consulting Physician over the Opinion of the Treating Physician?**

The treating physician rule which gives greater and sometimes controlling weight to the treating physician is based on the assumption that a medical professional who has dealt with a claimant over a long period of time has a deeper insight into the claimant's condition than one who has examined a claimant but once or simply reviewed the medical evidence. *See Barker v. Shalala*, 40 F.3d 789 (6th Cir. 1994). However, the ALJ is not required to accept any medical opinion, even that of a treating physician, if that opinion is not supported

15

by sufficient clinical findings. *See* 20 C.F.R. § 404.1527(d)(3); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("This court has consistently stated that the [Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").  A treating physician's opinion will not be given controlling weight unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); *see Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-31 (6th Cir. 1997) (stating that treating physicians' opinions are to be accepted when they are consistent with the evidence).  Here, the ALJ discussed at length the treating records of Drs. Shine and Kahn, as well as Plaintiff's other doctors (Tr. 16-19).  The ALJ accepted the diagnoses of coronary artery disease, hepatitis C, COPD, GERD, hypertension, and depression/nerves (Tr. 16-19).

Plaintiff argues the ALJ rejected the opinion of Dr. Shine, a treating physician, in favor of the opinion of Dr. Filka, a state-appointed doctor in violation of 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (Pl. Br. pp. 8-10).  Plaintiff also argues the ALJ did not consider the nature, extent, and quality of the relationship between Plaintiff and Dr. Shine in violation of 20 C.F.R. §§ 404.1527(d) and 416.927(d) (Doc. 12,  Pl.  Br. pp. 9-10).

The ALJ is authorized to reject the opinion of a treating physician if the treating physician's opinion is inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  The ALJ found that Dr. Shine's January 2006 and January 2007 opinion letters in support of Plaintiff's disability application, wherein Dr. Shine concludes that Plaintiff cannot perform physical labor on a short-term or full-time basis, were not supported

16

by Dr. Shine's own treating records. The ALJ explained that the treating records show many of Plaintiff's conditions are controlled through medication, are not at issue, or are stable (Tr. 19, 113, 300). Dr. Shine's opinion letters are also unsupported by Dr. Kahn, Plaintiff's cardiologist, who, as the ALJ observed, in the sense that Dr. Kahn never noted any restrictions on Plaintiff's activities (Tr. 19, 168-169, 209-212, 226-229, 266-267). Further, Dr. Shine's opinions are contradicted by Plaintiff's reports of his own activities, which include chopping firewood, mowing the lawn, and remodeling and carpentry work (Tr. 18-20, 233, 247). Substantial evidence, therefore, supports the ALJ's findings with respect to Dr. Shine's opinion letters. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 252, 529-531 (6th Cir. 1997). Substantial evidence also supports the significant weight accorded to Dr. Filka, who, consistent with the treating records of Drs. Shine and Kahn and the reports of Plaintiff's activities, concluded that Plaintiff was fit for light work subject to temperature and air quality restrictions (Tr. 19, 232-238).

Part of the analysis of the ALJ in reaching the conclusion Dr Shine's opinion was not entitled to controlling weight included an evaluation of the credibility of Plaintiff. In determining Plaintiff's residual functional capacity, the ALJ discussed the medical evidence and contrasted that with Plaintiff's testimony and other evidence regarding his pain and limitations (Tr. 19-20). The ALJ used a two-step process to evaluate Plaintiff's symptoms (Tr.19-20). *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir.). First, the ALJ determined if there was an underlying medically determinable physical condition or mental impairment that could reasonably be expected to produce Plaintiff's pain (Tr. 19). Second, the ALJ determined whether Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the

17

symptoms were substantiated by the objective medical evidence and credible based upon the entire record (Tr. 19). *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c).

The ALJ concluded that, while Plaintiff's impairments could reasonably be expected to produce the symptoms Plaintiff alleged, his statements regarding his symptoms were not substantiated by the objective medical evidence and the record as a whole (Tr. 19-20). Consequently, the ALJ concluded that the statements were not completely credible (Tr. 19-20).

The ALJ considered Plaintiff's daily activities, medication, possible side effects, and treatment other than medication under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), and these factors support the ALJ's credibility finding (Tr. 15-20). The medical evidence shows that Plaintiff's coronary heart disease is stable without frequent or severe episodes of respiratory distress (Tr. 17-19, 116, 122, 124, 213-214, 273, 275, 279, 281). Plaintiff's GERD is controlled when Plaintiff is compliant with his medications (Tr. 17-19, 273, 279). Plaintiff's COPD is somewhat reversible and also controlled with medication (Tr. 17-19, 114, 116, 281, 285). Plaintiff's high blood pressure is similarly controlled with medication (Tr. 17-19, 273, 275, 277). Plaintiff has never sought out professional mental health treatment for depression/nerves and has relied on medication, as needed (Tr. 17-20, 182, 249-261, 330). The ALJ concluded no medical evidence in the record supports Plaintiff's claim of dyslexia, and, while Plaintiff's literacy is limited, IQ tests demonstrate that Plaintiff is in the average range of intelligence (Tr. 18, 246-247, 327-328). Plaintiff's liver function tests have been normal, despite the hepatitis C diagnosis, and Plaintiff has never required treatment from a gastroenterologist (Tr. 17-19, 122, 124, 219). Plaintiff's cardiologist, Dr. Kahn, has not placed any restrictions on Plaintiff's activities (Tr. 19, 168-169, 209-212, 226-229, 266-267).

18

Other evidence which supports the ALJ's conclusion is found in a September 29, 2005, consultative examination.   Dr. Filka  concluded  Plaintiff was fit for light work.  Her opinion was that he would do well at a light or medium job (Tr. 19, 232-238).  As for Plaintiff's activities, Plaintiff reported playing the guitar, maintaining a garden, carving wood, fishing, mowing the yard, chopping firewood, and performing carpentry and remodeling projects. Although he denied being capable of cutting firewood in the administrative hearing, the notes of Dr. Filka reflect that Plaintiff kept busy cutting firewood for himself and reported performing this activity an hour or two at a time (Tr. 18-20, 233, 247,334).

Given the medical evidence and reports of Plaintiff's activities, discussed in detail by the ALJ, substantial evidence supports the ALJ's credibility finding and resulting residual functional capacity determination.  *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3);  *Buxton*, 246 F.3d at 772-73 (stating that substantial evidence presupposes a zone of choice within which the ALJ can go either way without interference by the courts).

In addition to considering the medical evidence, the ALJ also weighed Plaintiff's allegations against Plaintiff's reports of his activities, which included gardening, cutting firewood, and mowing the lawn and concluded that Plaintiff was capable of light work with additional restrictions related to air quality, temperature, and literacy (Tr.18-20, 233, 247, 335).  I conclude it was proper for the ALJ to consider these activities and the medical evidence in contrast to Plaintiff's allegations. Substantial evidence supports the ALJ's findings.  *See* 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (stating that a claimant's credibility may properly be discounted where the ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence).

19

B.  **Did the ALJ Err in Failing to Contact Plaintiff's Treating Medical Provider as Required by 20 CFR § 404.1512 (e)?**

In this section of Plaintiff's brief, there is some discussion of the fact of Dr. Kahn's not offering any opinion on Plaintiff's disability.  However, there is no discussion or authority beyond pointing to 20 CFR § 404.1512 (e) to spell out what the Plaintiff's argument is based on. Essentially, Plaintiff's claim that the ALJ failed to contact "Plaintiff's treating medical provider as required by 20 C.F.R. Section 404.1512(e)" is unsupported by argument.  *see Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 441 (6th Cir.2002) (explaining that conclusory arguments, without any further discussion or citation of authority, are waived).

In any event, I agree with the Commissioner, even if Plaintiff had developed an argument in support of this claim, it is without merit, because  Section 404.1512(e) applies when there is inadequate evidence to make a disability determination.  *See* 20 C.F.R. § 404.1512(e).  Here, the ALJ was able to make a disability determination based upon several years of medical evidence, as well as other evidence, and substantial evidence supports the ALJ's determination.  *See* 42 U.S.C. § 405(g).  He had the opinion of a Consultative Physician and opinions of non- examining State Agency Physicians.  In addition he relied upon his evaluation of Plaintiff's credibility and activities of daily living in reaching his conclusion Plaintiff was not disabled.

C.  **Did the ALJ Err in Finding there Exists a Significant Number of Jobs which Plaintiff could Perform?**

Plaintiff next argues the ALJ should have included additional limitations of no cutting and no bruising in the residual functional capacity as a consequence of Plaintiff's blood thinning medication (Doc 12,  Plaintiff's. Brief at10-11).  Although Plaintiff was taking blood thinning

20

medication, nothing in the medical record indicates that this prescription required such restrictions. None of the doctors' notes or opinions indicate any such restrictions. As seen above, the ALJ found Plaintiff's testimony to be not completely credible, and it appears the ALJ excluded the bruising and cutting limitations from Plaintiff's residual functional capacity (Tr. 19-20, 335). However, even if the residual functional capacity finding included the restrictions of avoiding cutting and bruising, I conclude substantial vocational evidence would still support the ALJ's finding that Plaintiff could perform a significant number of jobs. Plaintiff argues that, if such a limitation were included, the vocational expert's testimony shows that the number of jobs available is "not a very big number," and Plaintiff should have been found disabled (Doc. 12, Plaintiff's Brief at 10). The vocational expert's testimony and Sixth Circuit precedent does not support this. The vocational expert testified that, even adding the limitations of avoiding cutting and bruising to the hypothetical question, a range of sorter, stocker, and non-construction labor jobs would be appropriate (Tr. 341). The vocational expert testified that there were 875 such jobs in the region and 425,000 such jobs nationwide (Tr. 341).

In *Hall v. Bowen*, the Sixth Circuit explained that there is no "magic number" and a reviewing court should consider factors like the types and availability of jobs or the isolated nature of the types of jobs when deciding whether vocational evidence establishes a significant number of jobs under the Act. 837 F.2d 272, 275 (6th Cir. 1988). In *Hall*, the Sixth Circuit found 1,350 local or regional positions were a significant numbers of jobs. In *Harmon v. Apfel*, the Sixth Circuit considered a case with evidence of only 700 local jobs, but 700,000 national jobs and found that, "with no indication of gross concentration in a few areas," 700,000 jobs is "certainly" a significant number of jobs in the national economy. 168 F.3d 289, 292 (6th Cir.

1999).  Unpublished rulings by the Sixth Circuit have held that even smaller national totals than present here establish a significant number of jobs.  *See e.g.,  Bradley v. Comm'r of Soc. Sec.*, No. 02-3141, 2002 WL 1611471 at *2 (6th Cir. July 19, 2002) (finding 170,000 jobs in the national economy a significant number); *Stewart v. Sullivan*, No. 89-6242, 1990 WL 75248 at *4 (6th Cir. June 6, 1990), *cited in Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999) (finding 125 jobs in local geographic area and 400,000 jobs nationwide a significant number of jobs); *Nash v. Sec'y of Health & Human Servs.*, No. 94-5376, 1995 WL 363381 at *3 (6th Cir. June 15, 1995) (finding 70,000 jobs in the national economy a significant number).  I conclude even with the additional limitations of avoiding cutting and bruising, substantial vocational evidence establishes that Plaintiff can perform a significant number of jobs in the national economy.

## Conclusion

For the reasons stated herein, I RECOMMEND that the Commissioner's decision be AFFIRMED. I further RECOMMEND that the defendant's Motion for Summary Judgment (Doc. 18) be GRANTED, the plaintiff's Motion for Summary Judgment (Doc. 11) be DENIED, and this case be DISMISSED. [1]

Dated: June 15, 2009                    s/William B. Mitchell Carter

                                        UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).